Thank you, Your Honor. May it please the Court, Lawrence Rolfing on behalf of Jesus Orozco. This is a social security disability case. The vocational expert testified in the ALJ found that Mr. Orozco could perform roughly 180,000 jobs in the national economy despite his significant physical limitations, including the need to change positions every 30 minutes, and his lack of literacy. Mr. Orozco presented evidence to the Appeals Council at work. First, the vocational expert conceded during the hearing that the number of production line assembler or solderer jobs was not the 70,000 that she testified to, but actually 5,500 jobs, and the Commissioner has never defended that deviation. There's no explanation for it in the record under White v. Kijakazi. That job cannot stand, would stand scrutiny because the ALJ didn't deal with that issue in the decision. The other two jobs... Can I interrupt a moment? The magistrate judge said that the other two categories, electrical assembler, 88,000, wafer line workers, I have no idea what that is, 37,000, those were unchallenged, is that right? Those were unchallenged during the hearing process, but post-hearing before the ALJ decision, Mr. Orozco presented evidence from the Department of Labor that 26.7% of the jobs do not require a high school education or more, and that that number corresponds with the need for literacy. According to the Department of Labor, all of those jobs that do not require a high school diploma or more require literacy. The ALJ read the data from the Department of Labor as indicating that there would still be 73% of the jobs in the national economy did not require literacy, but that's not what the Department of Labor means. The Department of Labor, in the Occupational Requirements Survey, asked the question, is literacy required only when the respondent, the human resources at the employer, indicates that no high school diploma is required, there's no educational requirement? So either, my understanding is, in those jobs, those two job categories were eliminated as possibilities because they either required literacy or they required the high school diploma, and Mr. Orozco satisfies neither. Is that right? That's correct. They were totally eliminated? Yes. These jobs are electrical assembly type jobs. They are unskilled, but they still require the ability to read and write. That's just what literacy is, and it's not surprising in this day and age that when work has become more complex since 1977 when most of the DOT codes were last updated, that literacy is in fact required, and the Department of Labor says that literacy is required according to the data that the Department of Labor has collected. And so the question is, how did the ALJ deal with this contrary evidence? And the ALJ said, well, it leaves 73.3% of the jobs are still available, but that's clearly a misreading of the data. That's not a legitimate explanation of why Mr. Orozco meets either of the two criteria, either a high school diploma or more, or literacy. He satisfies neither, and so he can't perform those jobs. Okay, so the job that we're supposed to be focused on is this production line assembler job? In the production line assembler job, the commissioner has not defended either in the district court or in this court. The vocational expert testified clearly that she believed that there were 70,000 jobs, but her only source for that data is Job Browser Pro, which this court has addressed in two recent cases, Perkins and White. And she conceded on the record that the actual number of jobs reported by Job Browser Pro is 5,500. When asked to explain why she disagreed with Job Browser Pro, she said she didn't. She was just identifying the aggregate number of jobs within the industry selected by Job Browser Pro, which includes jobs that do not meet the criteria of production line solder or production line assembler. Solder being the name that the DOT gives to that particular DOT code. She also misidentified the SOC code, which is a further problem with that occupation. If I can come back to those first two jobs and the literacy requirement, I found the ALJ's opinion or order confusing because, on the one hand, she says that your client's illiterate. On the other hand, in describing his daily activities, she says he reads. What's going on? He has minimal reading capacity, but reading children's books isn't reading to learn. It's just... What's the testimony as to his reading? The testimony as to his reading... I don't believe he testified about reading at the hearing at all. So maybe the ALJ just made a mistake? It might have been in the functional reports. So there's a finding at page 30 of the ALJ's report. It's finding number eight. They claim it is illiterate and is able to communicate in English, but it doesn't say what it's based on. At the time of this ALJ decision, the commissioner had not changed the literacy regulations, and so the ability to communicate in English has been eliminated, and literacy and ability to communicate in English would correspond with illiterate in English. Probably. It's unclear. As Judge Fletcher has pointed out, it's unclear whether he was reading and writing in Spanish or reading and writing in English. But the judge clearly found that he was unable to read and write, and at least at the time of this decision, that means in English. And so it's unclear whether any of these jobs would be available, because the ALJ clearly found that Mr. Orozco was illiterate, despite the fact that she noted that he did do some nominal reading based on his written function reports, which were not written by him. Yeah, well, she doesn't say some nominal reading. She just says he does household chores, shops, reads, da-da-da. Yes. The other point is that under Social Security Ruling 83-12, the commissioner takes administrative notice as a matter of agency policy that people need to be able to sustain a posture to maintain productivity and unskilled work, and the vocational expert conceded that if he needs to change positions for up to two minutes, in addition to the normal breaks afforded an individual in the national economy, that that would in fact disrupt productivity and would eliminate the jobs that were identified, all of them. I'll reserve the rest of my time for rebuttal. All right. Thank you very much. Ms. Bond? Good morning, Your Honors. I'd like to confirm that you can hear me? Yes, loud and clear. Thank you. Thank you. Good morning. My name is Shea Bond, and I represent the Commissioner of Social Security in this matter. Just to address the literacy issue, it's on page 61 of the CAR. That is the hearing testimony. The ALJ had asked the claimant, when did you learn English? He said, on the job with my coworkers and friends. And the ALJ asked, can you read English? And he said, some. And then the ALJ asked for what's an example of what you can read in English? And then the claimant said, well, I can read a kid's book and short stories, something like that. And then he was asked if he could write in English, and he said a few words. So that's the evidence that the claimant had some, although minimal, ability to read or understand English. And he certainly could understand it verbally, which is what the ALJ concluded. Though, although illiterate and able to read and write English, he was able to understand through demonstration, and that testimony supports it. I would like just to jump directly to what Mr. Wolfing had acknowledged, was that at the hearing, did not question the vocational expert about those 37,000 wafer line assembly jobs. And those jobs involved batteries, assembly of batteries, is what that occupation involves. So Mr. Wolfing has conceded that that wasn't challenged using Job Browser Pro or any other source at the hearing. But after the fact, even though there was alternative data submitted, we have the ALJ explaining that the reason that she relied on the vocational expert's testimony over this alternative data was because the specific to this particular occupation, the wafer line worker jobs, was that the vocational expert had just recently done a labor market study on those very jobs. And I believe, I think that's at 82 of the record, my page up. But the vocational expert had explained that this labor market study had actually specifically looked at the intersection between this literacy and education issue, and then the ability to sit and stand at these jobs. And it was based on that study that she said that there were 37,000 of these in the national economy. Now, Mr. Wolfing did not challenge that testimony and the reliance on that labor market study in terms of job numbers at the hearing. And, you know, after the fact, we have, you know, submission of additional evidence or alternative evidence. But the ALJ explained that, you know, I'm looking at this evidence and I have a VE who did a recent labor market study. Her qualifications are unquestioned at the hearing by Mr. Wolfing. And she has this experience in this labor market study. She's relied on administratively noticed materials such as the DOT. And because of that, I'm relying, she said, I'm relying on the vocational expert's testimony. So in this circuit, when we have a very high standard, we have the recognition that the vocational expert's testimony alone is inherently reliable. Now, we agree that it's unassailable, but this court has set forth that the alternative evidence has to be significant and probative to overcome it. Can I interrupt you for just a minute? Yes. I've got the ALJ opinion here in front of me, and you said something about wafer line assembly jobs and so on. Where, I can't find it. I see where she's talking about literacy, but she seems not to be talking about wafers. She's talking about electronic equipment assemblers. Oh, well, it's page 31. It's approximately, I think, halfway down the page. But the sentence says, the statistic does not match the hypothetical. And then she says, additionally, the vocational expert indicated. Excuse me. Slow down. Do you have it in front of you? Yes. Okay, where? How many lines down do I go? So ignore the first paragraph. Ignore the second paragraph. And we're on the third paragraph. I'd say we're about, let's see, one, two, three, four, five, six, seven, eight, nine, ten, about 12 lines down. How does the sentence begin? It starts with, additionally, the vocational expert indicated performing a recent study of one of these positions. And what she means by one of these positions, that's referencing the wafer line assembler job. How do I know that? Because you look back to the hearing testimony. Let's see. I believe it might be page 81. Let's see. Okay, assuming that does reference wafer line, what is she saying about literacy with respect to wafer lines? As I read it, she says nothing. Are you talking about the ALJ's decision now? Yes, I am. Okay. So going back to the sentence, vocational indicated performing recent of these positions, that such a position would allow for the restrictions in the hypothetical. So the hypothetical question addressed both the literacy and then the sit-stand option. So that's what the paragraph, the sentences leading before that conclusion that the ALJ made, is talking about literacy and the sit-stand options. That sentence is incorporating both the literacy issue and the sit-stand option issue. It's a pretty slender read for me. You're reading an awful lot into a single sentence. It requires a lot of reference or incorporation. Well, I would disagree because it's really immediately preceding that sentence that the ALJ is talking about the representations being made by plaintiff in relation to the education and then also the sit-stand option. So I feel like the ALJ has been analyzing and specifically addressing the concerns that plaintiff had about these areas, literacy and sit-stand, and then says, I have my vocational expert who testified that with these specific wafer-line assembly jobs that it fits the parameters of the hypothetical question, and the hypothetical question addressed both literacy, education, and the capacity to sit and stand at this job. So I don't think it's a stretch. I think it's a reasonable read of this ALJ's decision, and it's accurate. We do have the VE testimony, and I apologize. I know it's cited in our brief, and I apologize I can't pull it up immediately in my reference to the hearing testimony, but it is in there, and I would say that's sufficient. So even if this court had questions about the other two occupations and the existence of jobs in those occupations based on Job Browser Pro or any other source, I would say that these remainder wafer-line worker jobs are sufficient because there are 37,000 of them, and under this court's circuit process, 25,000 is a significant number to support the ALJ's decision. And so even if we eliminate those other jobs, we still have a significant number of these wafer-line jobs, and the ALJ explained the reasons why she went with the vocational expert. Again, vocational expert is inherently reliable. The qualifications were never challenged at the hearing, never challenged afterward, and it's supported by this labor market study. And I'll point out that under Kilpatrick, one of the reasons why the alternative evidence was not deemed significant and probative is that it wasn't based on the same methodology and data. The plaintiff and the VE were not using the same methodology and data, and that's what we have here. We have a VE that used a different methodology and data, and plaintiff has not replicated that and has chosen. Oh, sorry, Your Honor. Sorry, I didn't get this from the briefs, but are you suggesting that we don't consider the production line assembly number of jobs, given the inconsistency in the VE's testimony as to those jobs? I think you're right. It's not clear from the briefing, but what I am saying is that even if you eliminate the jobs outside of the wafer line assembly, we still have a significant number, and I believe there was some questioning during the opening argument about the district court saying that, yeah, it would be harmless if there was any error. It would be harmless because we still have those 37,000 jobs within the wafer line assembly work, and that alone would be sufficient to support the finding here. But, I mean, really it's our position that, you know, the ALJ has explained why the alternative data for any of those jobs is not significant and probative, and, you know, under the facts of this case, even if the claimant could present, you know, alternative data that could be reasonable, the ALJ could rely on the VE's testimony in this case. It's just, you know, it's a weighing of the evidence, and the ALJ weighed it in favor of the VE, and that's entitled to deference. And we would ask that you to affirm that there are no other questions. All right. Thank you, counsel. Thank you. Mr. Rolfing? You're on mute. You're muted. Sorry about that. Both the occupation of the electronic, oops, the electrical assembler and the wafer line worker belong to the same occupational group of electronic assemblers. There are a lot of DOT codes in that group. Those are two of them. And so the data and the vocational expert clearly testified that they were in the same group. That's at page 81 of the card. They're both in 51-2022, electronic assemblers and production workers, electronic workers. That's what that they're both in that same group. The infirmity for both occupations, both electrical assembler and wafer line worker are tethered together. They are both in the same occupation group. The data applies to both DOT codes. And you say the data applies. Which data are you referring to? The data on literacy. The literacy requirement, okay. Correct. And if we throw out electrical assembler, wafer line goes with it because they're in the same data group. So what do we do with the production line assemblers and the discrepancy that the VE testified both that there were 70,000 and then she looked at the job browser pro and decided that there were 5,000 jobs? We throw out her testimony that there's 70,000 because the ALJ didn't explain why she accepted 70,000 instead of 5,500 by mechanically applying white versus Kijikazi. So are you asking us to remand? Yes. Now, in white, it was the same methodology applied both by the VE and by the representative of the claimant. That's not true here, correct? With respect to electrical assembler and wafer line worker, we're relying on alternate data from the Department of Labor. How about assembly line worker? The production line assembler is using the same methodology, job browser pro. We're using her testimony to hang her testimony. And so with respect to production line assembler, we're using the same methodology, but with respect to electrical assembler and wafer line worker, we're using alternate data from the Department of Labor that says that whatever she believes about the literacy requirements, it conflicts with the statistical data compiled by the Department of Labor, and the ALJ clearly misunderstood what the Department of Labor meant. And that cannot suffice as a reasonable explanation for why she found that an illiterate person could perform those two occupations. Unless there's any other questions, I rest. I'm already out of time. Did you call me? Okay. Well, thank you very much, Counsel. Orozco v. Kishikazi will be submitted, and we will take up McClendon v. Ressler.
judges: WARDLAW, FLETCHER, Korman